J-A08037-21

2021 PA Super 135

| D'ANNA BROWN AND CAMERON DEAN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| v. | : | |
| | : | |
| THE END ZONE, INC. D/B/A CLUB ONYX, RICK'S CABARET INTERNATIONAL, INC., NAH NICHOLS, TEZ REAL ESTATE, LP, AND TEZ MANAGEMENT, LLC | : | No. 193 EDA 2020 |
| | : | |
| APPEAL OF: THE END ZONE, INC. D/B/A CLUB ONYX | : | |

Appeal from the Judgment Entered December 18, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 160801029

| D'ANNA BROWN AND CAMERON DEAN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| Cross-Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 321 EDA 2020 |
| THE END ZONE, INC. D/B/A CLUB ONYX, RICK'S CABARET INTERNATIONAL, INC., NAH NICHOLS, TEZ REAL ESTATE, LP, AND TEZ MANAGEMENT, LLC | : | |

Appeal from the Judgment Entered December 18, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 160801029

| D'ANNA BROWN AND CAMERON DEAN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |

Cross-Appellants    :
:
:
v.          :
:
:    No. 322 EDA 2020
:
THE END ZONE, INC. D/B/A CLUB   :
ONYX, RICK'S CABARET   :
INTERNATIONAL, INC., NAH   :
NICHOLS, TEZ REAL ESTATE, LP,   :
AND TEZ MANAGEMENT, LLC   :
:

Appeal from the Judgment Entered December 18, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 170504021

D'ANNA BROWN AND CAMERON   :    IN THE SUPERIOR COURT OF
DEAN   :      PENNSYLVANIA
:
:
:
v.          :
:
:
:
THE END ZONE, INC. D/B/A CLUB   :
ONYX, RICK'S CABARET   :    No. 324 EDA 2020
INTERNATIONAL, INC., NAH   :
NICHOLS, TEZ REAL ESTATE, LP,   :
AND TEZ MANAGEMENT, LLC   :
:
:
:
APPEAL OF: THE END ZONE, INC.   :
D/B/A CLUB ONYX   :
:

Appeal from the Judgment Entered December 18, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): No. 170504021

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:         **FILED JUNE 29, 2021**

_____

* Former Justice specially assigned to the Superior Court.

J-A08037-21

In this consolidated action, Appellant/Cross-Appellee The End Zone, Inc. (d/b/a Club Onyx) appeals the judgment entered by the Court of Common Pleas of Philadelphia County upon a jury verdict in favor of Appellee/Cross-Appellant D'Anna Brown ("Brown").[1] In addition, Brown, along with Cameron Dean ("Dean") filed a cross-appeal from the judgment entered following the denial of their post-trial motion seeking (1) to remove the nonsuit entered against Brown in favor of Cross-Appellee Rick's Cabaret International, Inc. ("RCI")[2] and (2) to remove the nonsuit entered against Dean in favor of Cross-Appellee Tez Management, LLC.[3]

We affirm the judgment entered in favor of Brown against The End Zone and affirm in part the trial court's order entering nonsuit with respect to RCI. However, we reverse the trial court's entry of a nonsuit in favor of Tez Management, LLC and remand for a new trial limited to Dean's claims of liability and damages against Tez Management, LLC.

In August 2016, Brown and Dean jointly filed a negligence action (docketed at No. 01029-2016) against The End Zone, RCI, Nah Nichols, Tez Real Estate, LP, and Tez Management, LLC (collectively "the Defendants") to

_____

[1] "[A]n appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." **Young v. Lippl**, ___A.3d___, 2021 PA Super 56, at *1 n.1 (Pa.Super. Mar. 31, 2021) (citing **Johnston the Florist, Inc. v. TEDCO Constr. Corp.**, 657 A.2d 511, 514 (Pa.Super. 1995)).
[2] RCI is now known as RCI Hospitality Holdings, Inc. Answer, 4/19/17, at 1.
[3] "[I]n a case where nonsuit was entered, the appeal properly lies from the judgment entered after denial of a motion to remove nonsuit." **Neidert v. Charlie**, 143 A.3d 384, 387 n. 3 (Pa.Super. 2016) (quoting **Billig v. Skvarla**, 853 A.2d 1042, 1048 (Pa.Super. 2004)).

- 3 -

recover damages for serious injuries Brown and Dean sustained when a large fight broke out on August 10, 2014 at Club Onyx, a Philadelphia adult-entertainment venue.[4] Brown and Dean claimed Defendants were negligent in *inter alia*, serving alcohol after-hours and failing to satisfy compliance requirements for security and alcohol service despite prior enforcement measures taken against The End Zone and Club Onyx by the Liquor Control Board (LCB) and the City of Philadelphia. Brown and Dean claimed the Defendants' negligent operation of Club Onyx directly resulted in their injuries in the August 10, 2014 incident, which will be discussed further *infra*.

In May 2017, Brown filed a separate action (docketed at No. 04021-2017) against the Defendants sounding in fraud based on allegations that the Defendants forged Brown's signature on a release of liability document, or alternatively, falsely promised to pay Brown's medical bills in order to induce her to sign the release. Brown also raised an abuse of process claim as Defendants offered the allegedly forged liability release as a defense.

On August 8, 2017, the two cases were consolidated for discovery and trial. On April 29, 2019, the cases proceeded to a jury trial, which spanned several days of testimony. Brown testified that, on the night in question, she

_____

[4] At the time of the incident, The End Zone operated Club Onyx and employed Nah Nichols as club manager. The End Zone is a subsidiary of RCI, a Texas corporation. Tez Real Estate, LP owned the property where Club Onyx was located and leased the property to The End Zone. Tez Real Management, LLC is the sole general partner of Tez Real Estate, LP and a majority of Tez Management, LLC is owned by one of RCI's subsidiaries, RCI Holdings, Inc. N.T., 4/29/19, at 70-74; N.T. 5/2/19, at 286-87.

was working as an exotic dancer in the VIP room of Club Onyx where she earned approximately $3,000 to $6,000 each week depending on the tips she would make. Notes of Testimony (N.T.), Trial, 5/1/19, at 215-16, 229-30.

At approximately 3:50 a.m., a large fight broke out after a dancer named Mona Lisa struck one of the patrons with a vase. N.T., 5/6/19, at 35, 59. Brown was suddenly and severely injured when an unknown patron involved in the altercation threw a glass bottle that hit Brown in the mouth, causing her to become disoriented and momentarily lose consciousness. N.T., 5/1/19, at 247-48, 251-52. When Brown regained consciousness, a friend drove Brown to the emergency room where medical personnel discovered that Brown sustained multiple fractured front teeth on the top and bottom of her mouth and a broken bone in the top of her mouth. *Id*. at 252-64, N.T., 5/2/19, at 6-9.

Brown subsequently underwent surgery to replace the broken bone, required multiple sets of dentures, and was recommended to have further reconstruction surgeries, which included dental implants for her missing teeth. N.T., 5/2/19, at 9-14. Brown also suffered a concussion from the incident and reported experiencing persistent headaches, jaw pain, light sensitivity, and memory lapse. *Id*. at 14-19. Moreover, Appellee Brown indicated that she experienced psychological problems, such as depression, anxiety, and suicidal ideations, which ultimately led to her voluntary commitment into a mental health institution. *Id*. at 15-21.

Brown testified that she was eventually unable to pay for her dental reconstruction and forwarded her dental bills to Nah Nichols, manager of The End Zone. *Id*. at 22. While Nichols initially gave Brown checks for $875 and $1,500, Defendants claimed these funds were disbursed when Brown agreed to sign a liability release, which Brown denied. *Id*. at 26, 36-38, 257-59.

Plaintiff Dean also sought to recover damages for injuries he sustained during the August 10, 2014 altercation at Club Onyx, while he was working as a Floor Host. N.T., 5/6/19, at 30, 53. Dean was injured when he was struck in the head by an unknown patron with a large metal pole. N.T., 5/1/19, at 82; N.T., 5/6/19, at 39-40. Dean was taken to Thomas Jefferson Hospital where he received thirteen stitches to close his head wound. N.T., 5/1/19, at 85. N.T., 5/6/19, at 42.

The parties stipulated that Dean was barred from seeking damages for his injuries against The End Zone and RCI due to his receipt of workers' compensation benefits as an employee of The End Zone.[5] N.T., 4/29/19, at 14-15. However, the parties agreed Dean could still pursue his claims against Tez Real Estate, LP, and Tez Management, LLC. *Id*.

Brown and Dean also presented the testimony of Ed Anakar, who served as the corporate designee of The End Zone, Tez Real Estate, LP, and Tez Management, LLC. Anakar admitted that, prior to the incident in question, twenty-four instances of violence had occurred at Club Onyx, which involved

---

[5] Brown was not subject to this bar as she was deemed to be an independent contractor. N.T., 4/29/19, at 9-15.

shootings, fights, assaults, visibly intoxicated patrons, and disorderly operations. N.T. 4/29/19, at 77, 84-101; Plaintiff's Exhibit 1. After these incidents, The End Zone's continued operation of Club Onyx was made contingent on its compliance with additional conditions on its liquor license and occupancy permit through a conditional licensing agreement with the Liquor Control Board and a consent order by the City of Philadelphia. **See** N.T., 4/29/19, at 108-125; Plaintiff's Exhibits P-1 and P-2.

The conditional licensing agreement of May 21, 2013 required The End Zone become and remain compliant with the responsible alcohol management provisions (RAMP) of the Liquor Code, which included but was not limited to training of its alcohol service personnel and managers. **See** Plaintiff Exhibit P-1. The consent order of July 24, 2012 required The End Zone to comply with various security measures, including but not limited to hiring appropriately qualified security officers and to performing criminal background checks on its employees. **See** Plaintiff Exhibit P-2.

Appellant and Dean presented the expert testimony of Russell Kolins, a security practitioner and consultant. Kolins opined that the Defendants "had an obligation to provide security in a reasonable manner and failed to properly hire, vet, train, and supervise its proprietary staff, security staff that Defendants referred to as 'Floor Hosts.'" N.T. 5/1/19, at 74. Further, Kolins found that the Defendants failed to provide reasonable security by permitting visibly intoxicated individuals into the club and allowing those persons to be served alcoholic beverages by its staff. **Id**. at 76. Moreover, Kolins concluded

that on August 10, 2014, the Defendants "failed to provide security and serve alcoholic beverages in a reasonable manner" and these failures were the direct and proximate cause of Brown's injuries. *Id*.

At the conclusion of Brown and Dean's presentation of evidence in their case-in-chief, on May 6, 2019, the trial court entered a nonsuit in favor of RCI, Nah Nichols, Tez Real Estate, LP, and Tez Management, LLC. N.T., 5/6/19, at 157-58. The only claims that survived nonsuit were Brown's claims against The End Zone. As Dean had only brought claims against Tez Real Estate, LP, and Tez Management, LLC, the nonsuit ended Dean's participation in the trial.

The Defendants presented their evidence, which included the expert testimony of William LaTorre, a security and liquor compliance consultant, who was a former district commander in the Pennsylvania State Police assigned to the Bureau of Liquor Control Enforcement. LaTorre opined that The End Zone had in place and followed an adequate security plan and responded to the August 10, 2014 incident in a reasonable and appropriate manner. N.T. 5/2/19, at 146-47.[6]

_____

[6] The trial court permitted Defendants to present the testimony of their expert, LaTorre, during Brown and Dean's case in chief; the parties agreed to accommodate LaTorre's schedule as he would be unavailable later that week. Pennsylvania Rule of Civil Procedure 230.1 was amended to "change the prior practice whereby the entry of a compulsory nonsuit was precluded when any evidence had been presented by the defendant." Pa.R.C.P. 230.1, note. The current version of the rule provides "if the defendant presents evidence prior to the close of the plaintiff's case, the court shall consider, in addition to the plaintiff's evidence, only that defense evidence which is "favorable to the plaintiff." Pa.R.C.P. 230.1(a)(2).

On May 10, 2019, the jury returned a verdict in favor of Brown, finding The End Zone's negligence caused Brown's injuries and that The End Zone had committed "fraud by forgery" in presenting a liability release form that Brown had never signed. The jury awarded Brown $820,000 in compensatory damages: $800,000 for the negligence claim and $20,000 on the fraud claim.

In addition, the jury determined that the conduct of The End Zone was outrageous and in reckless disregard of Brown's safety. As such, the jury awarded Brown $500,000 in punitive damages: $450,000 for the negligent operation of Club Onyx and $50,000 for fraud. Accordingly, the jury awarded Brown a total verdict of $1,320,000.

The End Zone, Brown, and Dean filed timely post-trial motions. In addition, Brown filed a motion seeking delay damages pursuant to Pa.R.C.P. 238. On December 16, 2019, the trial court denied the parties' post-trial motions, molded the verdict to award Brown $78,798.62 in delay damages, and entered judgment on the molded verdict of $1,398,798.62.

On January 3, 2020, The End Zone filed a notice of appeal listing docket number 01029-2016. On January 11, 2020, The End Zone filed a notice of appeal listing docket number 04021-2017. On January 14, 2020, counsel for Brown and Dean filed two notices of appeal that listed both docket numbers.

After the parties filed applications to consolidate the appeals, this Court consolidated the four appeals as cross-appeals and designated The End Zone's appeal at 193 EDA 2020 to be the lead docket number. The parties complied

with the trial court's direction to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

As a preliminary matter, we must determine whether the parties complied with **Commonwealth v. Walker**, 646 Pa. 456, 185 A.3d 969 (2018), in which our Supreme Court held that the official comment to Pa.R.A.P. 341 requires appellants to file separate notices of appeal "where a single order resolves issues arising on more than one lower court docket[;] … [t]he failure to do so [prospectively] will result in quashal of the appeal." **Id**. at 470, 185 A.3d at 977.[7]

This Court has held that an appellant does not violate **Walker** by including multiple docket numbers on a notice of appeal, as long as the appellant files separate notices of appeal at each lower court docket. **Commonwealth v. J. Johnson**, 236 A.3d 1141, 1148 (Pa.Super. 2020) (*en banc*). This decision partially overruled **Commonwealth v. Creese**, 216 A.3d 1142 (Pa.Super. 2019) to the extent that **Creese** interpreted **Walker** to require quashal when the appellant files a notice of appeal that contains multiple docket numbers. In **J. Johnson**, this Court found there was no violation of **Walker** as it was "indisputable that [the appellant] filed a separate notice of appeal for each of the four dockets below, because he italicized only one case number on each notice of appeal." **J. Johnson**, 236 A.3d at 1148.

---

[7] The **Walker** court held that its ruling would apply prospectively to any notice of appeal filed after its June 1, 2018 ruling. **Walker**, 646 Pa. at 469-70, 185 A.3d at 977. Accordingly, the parties in this case were required to comply with the mandate of **Walker**.

This Court reached a similar result in **Commonwealth v. R. Johnson**, 236 A.3d 63 (Pa.Super. 2020) (*en banc*), in concluding that the appellant did not violate **Walker** in filing three notices of appeal listing all three docket numbers on each notice of appeal. This Court was able to determine that the appellant had filed separate notices of appeal, finding the documents were "clearly distinct" based on the differing time stamps and their location on each document. **R. Johnson**, 236 A.3d at 66. **Compare Creese**, 216 A.3d at 1143 (finding **Walker** violation when filing clerk accepted one notice of appeal for multiple dockets, time-stamped and photocopied the document, and filed copies at each individual docket).

In this case, The End Zone filed two separate notices of appeal for the negligence and fraud cases on January 3, 2020 and January 11, 2020, respectively. On January 14, 2020, counsel for Brown and Dean filed two notices of appeal that listed both docket numbers. We find Brown and Dean's notices of appeal are distinct documents as the first notice of appeal has a time stamp at 7:14 p.m. and the second has a time stamp of 7:17 p.m. In addition, the clerk's time stamp was placed in different locations on each notice of appeal. As the parties have complied with **Walker**, we may proceed to review the merits of the arguments in both appeals.

The End Zone raises the following arguments on appeal:

1. Did the Trial Court commit an error of law in determining that [The End Zone] did not preserve the issues raised in the Post Trial Motions?

2. Did the Trial Court abuse its discretion by not granting [The End Zone's] post-trial motion for judgment notwithstanding the verdict and to direct the entry of judgment in favor of [The End Zone]?

3. Did the Trial Court commit an error of law and/or abuse its discretion by allowing punitive damages on [Brown's] negligence and fraud claims to be submitted to the jury?

4. Did the Trial Court abuse its discretion by failing to grant [The End Zone's] motion for a new trial because the weight of the evidence went against the jury's verdict and was so contrary to the evidence as to shock the conscience?

5. Did the Trial Court commit an error of law and/or abuse its discretion by failing to grant [The End Zone's] post trial motion that the jury's award of punitive damages in the amount of $500,000 shocks the conscience and was excessive in light of the damages suffered by [Brown]?

6. Did the Trial Court abuse its discretion by failing to grant [The End Zone's] post trial motion for a new trial because the weight of the evidence went against the jury's award in the amount of $820,000.00 ($800,000 for alleged injuries and $20,000.00 for the Fraud Related to the Release) for compensatory damages in favor of Plaintiff Brown?

The End Zone's Brief, at 3-4 (reordered for ease of review).

Brown and Dean raise the following issues in their cross-appeal:

1. Did the trial court error as a matter of law by granting Defendants' oral motion for nonsuit as to Defendant, Rick's Cabaret International d/b/a Club Onyx, a/k/a RCI Hospitality Holdings, Inc., and failing to mold the verdict accordingly?

2. Did the trial court error as a matter of law by granting [The End Zone's oral motion for nonsuit as to Defendants Tez Real Estate, LLC, and Tez [] Management LLC[?][8]

Brown and Dean's Brief (as Cross-Appellees), at iii.

_____

[8] In Dean's post-trial motion and appellate brief, he only requested that the trial court and this Court vacate the order granting nonsuit against Tez Management, LLC and to award him a new trial against Tez Management, LLC.

- 12 -

J-A08037-21

As an initial matter, we address the trial court's finding that The End Zone has waived multiple issues on appeal due to its failure to properly raise them before the lower court. In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court found The End Zone did not raise specific grounds for relief in its post-trial motion arguing that it was entitled to Judgment Notwithstanding the Verdict (JNOV) and/or a new trial, but included boilerplate allegations.

It is well-established that Pa.R.C.P. 227.1 "requires parties to file post-trial motions in order to preserve issues for appeal," and "[i]f an issue has not been raised in a post-trial motion, it is waived for appeal purposes." *Board of Supervisors of Willistown Twp. v. Main Line Gardens, Inc.*, 638 Pa. 323, 332, 155 A.3d 39, 44 (2017) (quoting *Lane Enterprises, Inc. v. L.B. Foster Co.*, 551 Pa. 306, 710 A.2d 54 (1998)). Our Supreme Court has clarified that:

> Rule 227.1(b)(2) provides that the grounds for post-trial relief must be "specified in the motion," and that any grounds not so specified are deemed waived unless leave is subsequently granted upon cause shown to specify additional grounds. Pa.R.C.P. 227.1(b)(2). The Explanatory Comment to Rule 227.1(b)(2) makes clear that specification of the grounds for relief requires more than mere "boilerplate" language, and that the motion must instead provide the theories in support "so that the lower court will know what it is being asked to decide." Pa.R.C.P. 227.1(b)(2) (Explanatory Comment–1983) (quoting *Frank v. Peckich*, 257 Pa.Super. 561, 391 A.2d 624, 632–33 (1978)).

*Main Line Gardens, Inc.*, 638 Pa. at 332, 155 A.3d at 44.

This Court has specifically held that:

> A boiler[ ]plate motion, either that "the evidence was insufficient to support the verdict," or that "the verdict was against the weight of the evidence," is not a "precise statement of issues and grounds relied upon." Such assignments of error not only do not "foster"

- 13 -

but discourage "alert and zealous advocacy," for anyone may make them without giving thought to what the issues really are. ***Commonwealth v. Holmes***, 315 Pa.Super. 256, 461 A.2d 1268, 1273 (1983) (*en banc*). …

[As such,] a post-verdict motion, either that "the evidence was insufficient to support the verdict," or that "the verdict was against the weight of the evidence," will preserve no issue for appellate review unless the motion goes on to specify **in what respect** the evidence was insufficient, or **why** the verdict was against the weight of the evidence. ***Id***. at 1270 (emphasis in original).

***Commonwealth v. Rivera***, 238 A.3d 482, 497 (Pa.Super. 2020). Our courts have extended this disapproval of "boilerplate" motions to civil cases:

To permit the trial court to grant a new trial on the basis of a very general assignment of error, such as "the verdict is against the law" or "against the evidence," would result in losing the advantages of requiring specific assignments of error. Furthermore, to permit the trial court to make its own selection of reasons for granting a new trial, and then allocate those reasons under the rubric that the verdict was "against the law" or "against the evidence," would permit the court to grant a new trial for a reason that counsel would have been prevented from raising in the motion for new trial because at the time the alleged error occurred, no objection was made.

***Cauthorn v. Owens Corning Fiberglas Corp.***, 840 A.2d 1028, 1033–34 (Pa.Super. 2004). ***See also Paul v. Lankenau Hospital***, 524 Pa. 90, 569 A.2d 346, 349 (1990) (finding post-trial motion that contained boilerplate assertions regarding the sufficiency of the evidence supporting the defamation count failed to meet the specificity requirement of Rule 227.1).

In this case, the trial court found The End Zone's requests for JNOV were legally deficient because The End Zone failed to set forth any reasons why it believed Brown had failed to establish a *prima facie* case of negligence or fraud. Likewise, with respect to The End Zone's motion for a new trial, the

- 14 -

trial court found that The End Zone made no attempt to set forth specific reasons why the jury's verdict was against the weight of the evidence. We agree that these claims were not adequately preserved for appellate review.[9]

Likewise, The End Zone's claims challenging the trial court's denial of its request for JNOV or a new trial are also waived by its filing of a vague Rule 1925(b) statement. This Court explained in **Riley v. Foley**, 783 A.2d 807, 813 (Pa.Super. 2001) that Rule 1925 is a crucial component of the appellate process because it allows the trial court to identify and focus on those issues the parties plan to raise on appeal. Our courts have recognized that:

> When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review. When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues.
>
> In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.

---

[9] The trial court recognized that The End Zone had arguably raised a proper request for JNOV in its claim in its post trial motion asserting that the trial court erred in finding Brown was entitled to damages on the fraud count as Brown failed to offer testimony regarding the damages related to the forged release. However, the trial court also found this claim to be waived as The End Zone did not develop this claim as a JNOV issue in its post trial motion or in its subsequent court-ordered brief. We agree that the trial court properly exercised its discretion to find waiver. **See Main Line Gardens, Inc.**, 638 Pa. at 334, 155 A.3d at 45 (finding that when a party fails to comply with a trial court's direction to file a brief to further develop the issues raised in his or her post trial motion, the trial court has the discretion "to find waiver or, alternatively, to overlook the noncompliance and rule on the merits of the issues presented").

*Lineberger v. Wyeth*, 894 A.2d 141, 148 (Pa.Super. 2006) (quoting *Commonwealth v. Dowling*, 778 A.2d 683, 686-87 (Pa.Super. 2001)).

In this case, the trial court found that The End Zone's 1925(b) statement did not include sufficient detail to identify specific arguments to be raised on appeal when it raised general claims that the trial court erred in denying its request for JNOV or a new trial. As such, the trial court did not address these claims. As The End Zone's vague concise statement hampered appellate review, we agree that The End Zone has waived these particular claims for appellate review on this basis as well.

As such, the only issues that The End Zone preserved for appeal are its intertwined claims that the trial court erred in denying its request for a new trial on damages or remittitur of both the awards of compensatory and punitive damages. The End Zone argues that the weight of the evidence did not support the jury's award of $820,000 in compensatory damages and $500,000 punitive damages, which The End Zone argues were grossly excessive, shock the conscience and were unjust to The End Zone, considering primarily, the nature of Brown's injuries.

Specifically, The End Zone argues that Brown's dental injuries were limited to replacing four of her teeth with dental implants, which Brown's experts estimated would cost $70,000 and The End Zone's expert estimated to cost $23,000. In addition, The End Zone characterized Brown's head injuries as minimal and pointed out that Brown did not seek treatment for

such injuries until after she was injured in a subsequent March 2015 car accident.

In addition, The End Zone asserts that Brown's ability to earn money was not substantially affected by the August 10, 2014 incident as Brown returned to work full-time as a dancer at Club Onyx in September 2014 and continued to work there until her March 2015 car accident. Thereafter, Brown also returned to work at Club Onyx in September 2015. The End Zone argues that Brown did not make any specific allegations as to loss of wages.[10]

Our standard of review is as follows:

> Under Pennsylvania law, the decision to grant a remittitur depends on whether the award of compensatory damages lies beyond "the uncertain limits of fair and reasonable compensation" or whether the verdict "so shocks the conscience as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." **Potochnick v. Perry**, 861 A.2d 277, 285 (Pa. Super. 2004). This standard is highly deferential, because the trial judge serves not as finder of fact but as impartial courtroom authority with obligation to give great respect to the jury's function. **Ferrer v. Trustees of Univ. of Pennsylvania**, 573 Pa. 310, 825 A.2d 591, 611 (2002). If the compensatory award is excessive, any remittitur must fix "the highest amount any jury could properly award." **Neal v. Bavarian Motors**, 882 A.2d 1022, 1028 (Pa.

---

[10] To support its argument that remittitur is warranted, the End Zone also includes additional allegations that the jury was prejudiced against the End Zone after hearing testimony about the release and Club Onyx's past problems and from improper comments made by Brown and Dean's attorney in closing argument. However, the End Zone does not reference where in the record the admissions occurred and does not show it made timely objections to the admission of this evidence. Further, the End Zone did not raise separate claims in its post-trial motion or in its appellate brief that the trial court abused its discretion in admitting this evidence such a new trial was warranted. We agree with the trial court's finding that these unpreserved and undeveloped arguments do not warrant further review.

Super. 2005). That amount "must necessarily be as high—and may well be higher—than the level the court would have deemed appropriate if working on a clean slate." *Id.* This Court is not free to substitute its judgment for that of the fact finder. "Rather, it is our task to determine whether the lower court committed a 'clear' or 'gross' abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur." ***Dubose v. Quinlan***, 125 A.3d 1231, 1244 (Pa. Super. 2015) (citation omitted).

Each personal injury case "is unique and dependent on its own special circumstances." ***Kemp v. Philadelphia Transportation Co.***, 239 Pa.Super. 379, 361 A.2d 362, 364 (1976). Thus, noneconomic loss must be measured by experience rather than any mathematical formula. ***Martin v. Soblotney***, 502 Pa. 418, 466 A.2d 1022, 1025 (1983) ("it is immediately apparent that there is no logical or experiential correlation between the monetary value of medical services required to treat a given injury and the quantum of pain and suffering endured as a result of that injury"). For this reason, the law entrusts jurors, as the impartial acting voice of the community, to quantify noneconomic loss and compensation. ***Nelson v. Airco Welders Supply***, 107 A.3d 146, 161 (Pa. Super. 2014).

***Hammons v. Ethicon, Inc.***, 190 A.3d 1248, 1285–86 (Pa.Super. 2018).

With respect to The End Zone's challenge to the compensatory damage award, we are mindful of the following principles:

This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. A court may consider the following factors, *inter alia*:

(1) the severity of the injury; (2) whether the Plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the Plaintiff (and, herein, the court pointed out that where the injury is manifested by broken bones, disfigurement, loss of consciousness, or other objective evidence, the courts have counted this in favor of sustaining a verdict); (3) whether the injury will affect the Plaintiff permanently;

- 18 -

(4) whether the Plaintiff can continue with his or her employment; (5) the size of the Plaintiff's out-of-pocket expenses; and (6) the amount Plaintiff demanded in the original complaint.

***Paliometros v. Loyola***, 932 A.2d 128, 134-35 (Pa. Super. 2007) (some citations omitted).

***Spencer v. Johnson***, 249 A.3d 529, 572 (Pa.Super. 2021).

With respect to The End Zone's challenge to the punitive damage award, the following principles apply:

[T]he law of this Commonwealth calls for the appellate courts to determine whether the trial court has committed any abuse of discretion when reviewing a jury's punitive damage verdict, or whether on complete and exhaustive review of the record it shocks the court's sense of justice in a given case. ***Sprague v. Walter***, 441 Pa.Super. 1, 656 A.2d 890, 928 (1995). We evaluate the award of punitive damages with respect to the following principles:

Under Pennsylvania law, the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion. In accordance with this limitation, the standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant.

***Hollock v. Erie Ins. Exch.***, 842 A.2d 409, 419 (Pa.Super. 2004).

***Empire Trucking Co. v. Reading Anthracite Coal Co.,*** 71 A.3d 923, 938 (Pa.Super. 2013) (some citations omitted).

In reviewing The End Zone's request for a new trial or remittitur, the trial court set forth a thorough analysis of its decision to uphold the jury's verdict awarding Brown both compensatory and punitive damages.

- 19 -

In this case, the jury heard both witness and expert testimony that Ms. Brown was caused to suffer a bottle strike to the head with such force that she suffered several teeth being ripped from her skull, a mandible fracture, and a severe and permanent neurological injury, due solely to the negligent and outrageous conduct of Defendant End Zone. In turn, Defendant End Zone outrageously compounded these injuries by creating a forged release and subjecting Ms. Brown to a trial in which she was outrageously forced to suffer through the pain and suffering of fraudulently being called "a scam artist."

As the Court will recall, the jury was presented in the person of Ms. Brown with the exact opposite of a malinger; for example, when asked (without any objection) to remove her dentures so that the jury could view the extent of her mouth injury, Ms. Brown was noticeably shook, began to cry, and attempted to cover her mouth, making it readily apparent the extreme depth of her humiliation and sorrow at her painful and disfiguring injury. The injuries to Ms. Brown were all the more severe, owing to the fact that she was a very young woman who was entirely self-supporting, and the fact that, as a dancer, her ability to earn a living were [sic] entirely dependent on her appearance and self-confidence. Indeed, as the jury learned, Ms. Brown's injuries were so catastrophic as for her to become suicidal and voluntarily commit herself to a mental health facility. As Defendant End Zone acknowledges, there was expert testimony that Plaintiff Brown needs $70,000.00 in dental work, but assessing a dollar value on extreme trauma, brain injury, physical pain, and humiliation suffered by Plaintiff Brown is uniquely within the province of the jury.

On this record, $800,000 in compensatory damages for the injuries that Ms. Brown suffered due to the negligent conduct of Defendant End Zone cannot possibly be said to be excessive: she suffered catastrophic oral and neurological injuries that she will live with for the many decades of life she has ahead of her, and unspeakable pain, suffering, and humiliation. Such injuries will be felt and suffered by Ms. Brown every single day of the remainder of her life. Given the nominal award of $20,000 for Defendant End Zone's flagrantly fraudulent conduct, this amount cannot possibly be said to be excessive, either. The award of $450,000 in punitive damages for the outrageous misconduct of Defendant End Zone in the operation of Club Onyx (which included serving alcohol after-hours and failing to provide adequate security in violation of, *inter alia*, a Consent Order of July 25, 2012, and a

Conditional Licensing Agreement of May 21, 2013) and $50,000 in punitive damages for the outrageousness of fraudulently forging a release likewise cannot possibly said to be excessive under the facts at hand, especially as the punitive damage award is significantly lower than the compensatory damages award. **Daley v. John Wanamaker, Inc**., 464 A.2d 348, 353 (Pa.Super. 1983) ("In the case at bar, the award of punitive damages is only one and a half times the amount of compensatory damages awarded. We cannot say that such an award is improper by law since courts have upheld punitive damages proportionally greater than this") (reversing trial court that granted remittitur).

Trial Court Opinion (T.C.O.), 6/29/2019, at 34-36.

Based on this analysis, we agree with the trial court's assessment that the jury's verdict is supported by the record and do not find that such a verdict is excessive or that it "shocks the conscience as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." **Hammons**, **supra**. Accordingly, we find the trial court properly exercised its discretion in denying The End Zone's request for a new trial on damages or remittitur.

Turning to the cross-appeal, Brown and Dean argue that the trial court erred in granting the Defendants' motion for nonsuit filed at the end of the presentation of Brown and Dean's case-in-chief, allowing for the dismissal of RCI and Tez Management, LLC from the litigation.

Our courts have recognized that "[a] motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action." **Gregury v. Greguras**, 196 A.3d 619, 625 (Pa.Super. 2018).

A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Pa.R.C.P. 230.1(a), (c); *see Commonwealth v. Janssen Pharmaceutica, Inc.*, 607 Pa. 406, 8 A.3d 267, 269 n. 2 (2010). Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." *Agnew v. Dupler*, 553 Pa. 33, 717 A.2d 519, 523 (1998). The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

*Scampone v. Highland Park Care Ctr.*, 618 Pa. 363, 57 A.3d 582, 595–96 (2012). The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law. *Barnes v. Alcoa, Inc.*, 145 A.3d 730, 735 (Pa. Super. 2016).

*Baird v. Smiley*, 169 A.3d 120, 124 (Pa.Super. 2017).[11]

More specifically, Brown argues that the trial court erred in granting a nonsuit in favor of RCI and asks that the verdict be molded to reflect that RCI is jointly and severally liable for the verdict against The End Zone. Brown alleges that RCI directly controlled the ownership and operations of The End Zone, which Brown characterizes as a mere "puppet" or "robot" of RCI. Brown asserts that "when a supposed subsidiary is merely the 'puppet' or 'robot' of

---

[11] Our rules of civil procedure provide that a nonsuit may be entered in "favor of one defendant at the close of plaintiff's case against all defendants prior to the presentation of evidence by the defense only if the other defendant(s) stipulate on the record that they do not intend to present evidence as to the moving defendant's liability." *Baird*, 169 A.3d at 124–25 (quoting Pa.R.C.P. 230.1(c)). If the defendants do not agree to this stipulation, then the moving defendant may seek a directed verdict at the end of trial. *Id*. at 125 (citing Pa.R.C.P. 2232(d)).

its parent company, the parent company and the subsidiary are jointly and severally liable." Brown's and Dean's Brief, 11/30/20, at 20 (citing *In re Davos*, *Inc.*, 310 B.R. 520 (Bankr. W.D.Pa. 2004)).

While Brown solely relies on a decision from a lower federal court to support her claim, she fails to recognize the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted).

Our own courts have discussed the equitable concept of piercing the corporate veil, which allows courts to "disregard [] corporate form in order to assess one corporation's liability against another." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 644, 194 A.3d 1010, 1034–35 (2018). However, we emphasize that:

> Pennsylvania law has a strong presumption against piercing the corporate veil. *Lumax Industries, Inc. v. Aultman,* 543 Pa. 38, 669 A.2d 893, 895 (1995). Any inquiry involving corporate veil-piercing must "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Wedner v. Unemployment Compensation Bd. of Review*, 449 Pa. 460, 296 A.2d 792, 794 (1972).

*Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 58 n.7 (Pa.Super. 2012). "Care should be taken on all occasions to avoid making the entire theory of corporate entity ... useless." *S.T. Hudson Engineers,*

*Inc. v. Camden Hotel Dev. Assocs.*, 747 A.2d 931, 935–36 (Pa.Super. 2000) (citations omitted).

Our courts have held that "[t]he corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." *Golden Gate Nat'l Senior Care LLC*, 648 Pa. at 644, 194 A.3d at 1034–35 (citations omitted). In deciding whether to disregard the corporate form, our courts have considered several factors such as "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetuate a fraud." *Advanced Tel. Sys., Inc. v. Com-Net Pro. Mobile Radio, LLC*, 846 A.2d 1264, 1277–78 (Pa.Super. 2004) (citing *Lumax Industries, Inc.*, 543 Pa. at 41–42, 669 A.2d at 895 (some citations omitted)).

One such exception that allows a court to pierce the corporate veil is the alter ego theory which applies "where the individual or corporate owner controls the corporation to be pierced, and the controlling owner is to be held liable." *S.T. Hudson Engineers, Inc.*, 747 A.2d at 935–36 (citations omitted). Specifically,

> the alter ego theory which requires proof (1) that the party [or parent corporation] exercised domination and control over corporation; and (2) that injustice will result if corporate fiction is maintained despite unity of interests between corporation and its principal.

J-A08037-21

*Allegheny Energy Supply Co., LLC*, 53 A.3d at 58, n.7.  For this exception

to apply, the record must demonstrate that:

> the subsidiary is the 'alter ego' of the parent to the extent that domination and control by the parent corporation renders the subsidiary a mere instrumentality of the parent; under such extreme circumstances the parent corporation may be held to be doing business within the state under the facade of the subsidiary.

*Botwinick v. Credit Exch., Inc.*, 419 Pa. 65, 72, 213 A.2d 349, 353–54

(1965) (citations omitted).

As noted above, Brown never specifically argued that the trial court

should pierce the corporate veil to find RCI jointly and severally liable for

judgment against The End Zone, but merely alleged that The End Zone was

RCI's "puppet."  In support of this argument, Brown pointed to the testimony

of Ed Anakar, the corporate designee for The End Zone, RCI, and the Tez

Defendants and the president of RCI Management Services, Inc., which is

another subsidiary of RCI.[12]  Anakar testified that The End Zone was a

subsidiary owned by the parent company RCI, which held total ownership in

stock of The End Zone.

While neither the trial court nor Brown discussed the concept of piercing

the corporate veil, we agree with the trial court that the facts presented by

Brown did not warrant vacating the nonsuit in favor of RCI.  In determining

whether the alter-ego exception applies, our Supreme Court specified that:

> [n]either the similarity of names between the parent and subsidiary corporation, nor the total ownership of the stock of the

---

[12] RCI Management Services, Inc. is not a party to this case.

- 25 -

subsidiary by the parent nor the fact that a single individual is the active chief executive of both corporations will per se justify a court in piercing the corporate veil if each corporation maintains a bona fide separate and distinct corporate existence.

**Botwinick**, 419 Pa. at 72, 213 A.2d at 353–54 (citations omitted).[13]

In reviewing the record in this case, we find Brown did not present sufficient evidence to overcome the presumption against piercing the corporate veil to impose liability upon RCI, as The End Zone's parent company. Other than citing the facts stated above, Brown did not attempt to show that (1) that the RCI exercised domination and control over The End Zone; and (2) that injustice would result if corporate form is maintained. As a result, we conclude that the trial court did not err in granting a nonsuit in favor of RCI.

Dean also argues in the cross-appeal that the trial court erred in refusing to remove the nonsuit entered in favor of Tez Management, LLC, the corporation that leased the premises to The End Zone to operate Club Onyx. The trial court granted nonsuit on the basis that Tez Management LLC was a

_____

[13] Brown also suggested in her post trial motion that the trial court should have granted her motion to remove the nonsuit against RCI based on comments made by The End Zone's counsel in closing argument at the conclusion of the trial. Brown characterized such statements as admissions that The End Zone was a mere "shell company" designed to protect RCI.

However, Brown acknowledged in her appellate brief that the statement of The End Zone's attorney in closing argument was not itself evidence. Brown's Brief, at 10. Moreover, the trial court correctly refused to consider these statements in resolving whether nonsuit against RCI was proper as the trial court was limited to considering the evidence presented by the plaintiff "at the close of the plaintiff's case against all defendants on liability." **Baird**, 169 A.3d at 124. **See also** Pa.R.C.P. 230.1 (specifying that "[t]he court in deciding the motion [for nonsuit] shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case").

landlord out-of-possession, and thus was not liable to Dean for injuries on the

premises.

The following principles apply to our analysis of this claim:

As a general rule, a landlord out of possession is not liable for injuries incurred by third parties on the leased premises because the landlord has no duty to such persons. **Dorsey v. Continental Associates**, 404 Pa.Super. 525, 591 A.2d 716, 718 (1991); **Kobylinski v. Hipps**, 359 Pa.Super. 549, 519 A.2d 488, 491 (1986); **Henze v. Texaco, Inc.**, 352 Pa.Super. 538, 508 A.2d 1200, 1202 (1986) (citing, *inter alia,* Restatement (Second) of Torts § 356 (1965)). This general rule is based on the legal view of a lease transaction as the equivalent of a sale of the land for the term of the lease. **Deeter v. Dull Corporation, Inc.**, 420 Pa.Super. 576, 617 A.2d 336, 339 (1992). Thus, "liability is premised primarily on possession and control, and not merely [on] ownership." **Id**.

**Jones v. Levin**, 940 A.2d 451, 454 (Pa.Super. 2007).

Specifically, in this case, the trial court rejected Dean's claim that he was entitled to relief based on Section 359 of the Restatement (Second) of Torts, which contains the following exception to a landlord's liability:

A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm caused to persons who enter the land for that purpose by a **condition of the land existing when the lessee takes possession**, if the lessor

(a) knows or by the exercise of reasonable care could discover that the condition involves an unreasonable risk of harm to such persons, and

(b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception, and

(c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it.

Restatement (Second) of Torts § 359 (1965) (emphasis added).

In response to the motion for nonsuit, Dean complained that the Tez Management, LLC should have been held liable for the activities of its tenant, The End Zone, when its negligent operation of Club Onyx led to Dean's injuries. The trial court found this Section 359 of the Restatement to be inapplicable to the facts of this case as this section applies specifically to "a condition of the land existing when the lessee takes possession." *Id*.

We similarly reject Dean's claim that Section 359 should be construed broadly to characterize The End Zone's operation of Club Onyx to be a condition of the land existing when The End Zone took possession of the property that it leased from Tez Management, LLC.

Nevertheless, the essence of Dean's claim appears to be encompassed in Section 379A of the Restatement (Second) of Torts, which contains the following exception to a landlord's liability:

> A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if,
>
> (a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and
>
> (b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

Restatement (Second) of Torts § 379A (1965).

While Dean did not specifically cite to Section 379A of the Restatement in responding to the motion for nonsuit, his counsel repeatedly argued that

Tez Management, LLC should be subject to liability as lessor as it knew that its lessee, The End Zone, was negligently operating Club Onyx on the leased premises and had reason to know that this activity would unavoidably involve an unreasonable risk of physical harm to the patrons of Club Onyx. N.T., 5/6/19, at 87.

As noted above, it is undisputed that, as a result of multiple violent acts on the premises that occurred prior to the incident in this case, The End Zone's operation of Club Onyx was made contingent on its compliance with the conditional compliance agreement set forth by the LCB and the consent order by the City of Philadelphia. *See* N.T., 4/29/19, at 108-125; Plaintiff's Exhibits P-1 and P-2.

Brown and Dean argued that the Tez Management, LLC had actual knowledge that The End Zone "was knowingly and intentionally operating in violations of the Conditional Licensing Agreement and the Consent Order," by failing to provide adequate security, illegally serving alcohol after hours, and in operating without the required RAMP certification. N.T. 5/6/19, at 89.

As the corporate designee for both The End Zone and Tez Management, LLC was the same person, Ed Anakar, Dean argued that Tez Management, LLC was in a perfect position to view Club Onyx and The End Zone's activities as they were owned, operated, and controlled by the same individuals. N.T., 5/2/19, at 286-87. Brown and Dean's expert witness in professional security, Russell Kolins, opined that based on the evidence presented, Tez Management, LLC knew or should have known the problems The End Zone

exhibited and their past prior history of incidents and nevertheless allowed those problems to exist on its property as lessor.  N.T. 5/1/19, at 155.

In reviewing the evidence Dean presented as plaintiff, giving him the benefit of all reasonable inferences arising from this evidence, and in resolving all evidentiary conflicts in his favor, we find that the trial court's entry of nonsuit in favor of Tez Management, LLC was improper as we disagree with its finding that no liability exists based on the relevant facts and circumstances.

For the foregoing reasons, we affirm the judgment in favor of Brown against The End Zone and affirm in part the trial court's order granting nonsuit in favor of RCI.  We reverse in part the trial court's order granting nonsuit in favor of Tez Management, LLC and remand for a new trial on liability and damages on Dean's claims against Tez Management, LLC.

Judgment in favor of Brown against The End Zone affirmed.  Order granting nonsuit reversed in part.  Remand for a new trial limited to Dean's claims against Tez Management, LLC.  Jurisdiction relinquished.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/29/2021

- 30 -